# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

v.                                            Crim. No. 18-2748 KG-1

RONALD WILLIAM TORRES,

       Defendant.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

THIS MATTER is before the Court on Defendant's Motion to Suppress (*doc. 18*), the attendant briefing (*docs. 27, 34*), and the hearing conducted on December 6, 2018 (*doc. 35*).[1] Having reviewed the Motion and the applicable law, I RECOMMEND that the Court DENY Defendant's Motion to Suppress.

## I.    BACKGROUND

On May 15, 2018 between 11:30 and 11:45 a.m., Las Cruces Police Department (LCPD) Officer Paul Lujan and United States Border Patrol Agent Arturo Morales were conducting surveillance of a duplex apartment at the intersection of Alamo Street and Colorado Avenue.  Tr. at 6; *doc. 27* at 1.  Both Officer Lujan and Agent Morales were on

---

[1] Attached hereto are the documentary exhibits submitted to the Court at the hearing held on December 6, 2018 and not otherwise found on the docket.  It does not include the video exhibits which have been retained by the government.

temporary assignment as Task Force Officers with the Federal Bureau of Investigation (FBI). The apartment was the subject of an ongoing federal investigation into drug trafficking that had already resulted in the seizure of methamphetamine and heroin from approximately four to five traffic stops of vehicles leaving the house. Tr. at 13, 95–96. These surveillance officers were located in a parking lot northwest of the intersection of Colorado Avenue and S. Espina Street, less than a block to the west of the duplex. *See* Govt. Exhibit 9.

Officers Lujan and Morales observed a white SUV approaching the target residence on Colorado Avenue. It slowed to let out a female passenger, did a U-turn, and parked illegally on the wrong side of the road in front of the duplex. Tr. at 11. The officers saw the female passenger approach the duplex. Though they were unable to see which apartment she entered, Officer Lujan explained in his testimony that only the target apartment was occupied at the time; the other was vacant. Tr. at 12. Approximately sixty seconds after exiting the white SUV, the female passenger returned and got back into the vehicle. Tr. at 17.

After observing the parking violation, Officer Lujan, who was conducting surveillance in an unmarked vehicle, radioed nearby LCPD Officer Nathan Krause to make a traffic stop.[2] Tr. at 13. The radio communication described the vehicle as a

---

[2] In fact, Officer Krause had also personally observed the parking violation when he earlier drove by that stretch of Colorado Avenue. Tr. at 30.

white SUV, but did not include a model or license plate number.  Tr. at 21–22, 56.

Before Officer Krause could make a traffic stop, the SUV drove westbound on Colorado

(toward the surveillance officers) and turned southbound on S. Espina Street.  Tr. at 56–

57.  At this time, the surveillance officers lost sight of the SUV.  The white SUV was next

observed a block or two later by Officer Krause when he was heading westbound on

Arizona Avenue or Nevada Avenue.  Tr. at 53.  Officer Krause concluded that the white

SUV he observed was the same white SUV because it was the only white SUV traveling

southbound on Espina at that time and its arrival—only seconds after the surveillance

officers lost sight of the target white SUV—matched with expected arrival of the target

vehicle.  Tr. at 77–78.  At this point, Officer Krause pulled behind the white SUV and

soon thereafter initiated the traffic stop.  Immediately, LCPD Officers Manuel Frias and

Justin Ramirez arrived on scene to assist.  *See doc. 27* at 2; Govt. Exhibit 2 at 0:33.

The entirety of the traffic stop, up to and including the time of Mr. Torres' arrest,

lasted approximately seventeen minutes and was recorded by the lapel cameras of

Officers Frias, Krause, and Ramirez.  *See* Govt. Exhibits 1–6.  Officers approached Mr.

Torres' vehicle, immediately noting the strong odor of burnt marijuana.  Officer Krause

explained the parking violation and asked Mr. Torres for his license, registration, and

medical marijuana card, which Mr. Torres provided.  *See* Govt. Exhibit 2 at 1:00.  While

Officer Krause returned to his vehicle to check this documentation, Officer Frias,

standing by the passenger side window, began questioning the female passenger about

her name and identification.  This questioning began approximately two minutes into the stop.[3]  *See* Govt. Exhibit 1 at 1:50.  She provided a name, Audrey Oliver, but no identification documents.  She was also unable to state her social security number.  Nearly four minutes into the stop, officers received the "all clear" for Mr. Torres over dispatch.  *See* Govt. Exhibit 2 at 3:55; *doc. 27-1*, Govt. Exhibit 1-A at 3.  Officer Krause then reported to the other officers that Mr. Torres had come back clear, stating, "I got nothing."  *See* Govt. Exhibit 2 at 5:30; *doc. 27-2*, Govt. Exhibit 2-A at 3.

Although the name provided by the passenger, Audrey Oliver, had also come back clear on dispatch, officers were suspicious about her identity and asked her to step out of the vehicle to speak with them.  *See* Govt. Exhibit 1 at 5:37.  Officer Ramirez began questioning the passenger while Officer Frias engaged in conversation with Mr. Torres about a recent shooting in which Mr. Torres had been the victim.  Officer Ramirez explained to the passenger that they needed to obtain photo identification and that he did not believe she was who she claimed to be.  He also informed her that her action of briefly entering the house on Colorado Avenue was suspicious and resembled a drug transaction.  *See* Govt. Exhibit 3 at 5:45–6:20.  He explained that he was going to run her name and date of birth through the system in order to obtain a photograph, which would conclusively determine whether she was lying about her identity.  *See doc*

---

[3] Unless otherwise noted, all times are measured from the start of Officer Krause's lapel camera footage (Govt. Exhibit 2).

*27-3*, Govt. Exhibit 3-A at 5–6.  While waiting to obtain the photograph and just over nine minutes into the stop, the passenger admitted that she had given a false name because she had outstanding warrants.  *See* Govt. Exhibit 3 at 8:13.  Upon further questioning, around eleven minutes into the stop, she admitted that she had gone into the house to pick up some marijuana, then, when pressed by Officer Ramirez, that she had actually gone to pick up "black" (heroin).  *See* Govt. Exhibit 3 at 10:20–10:30.  She provided her real name, Samantha Espinoza, as well as her date of birth and social security number.  *See* Govt. Exhibit 3 at 13:00.  As Officer Ramirez's questioning continued, she also admitted that she had a blunt of marijuana concealed in her bra.  *See* Govt. Exhibit 3 at 14:33.  However, she remained firm in her statement that, while she had gone to the house with the intention of purchasing drugs, she had not actually purchased any.  No narcotics were later found on her person.

After Ms. Espinoza admitted to going to the house to purchase heroin and provided her real name, but before she admitted to concealing the blunt of marijuana,[4] Officer Krause explained to Mr. Torres that Ms. Espinoza had given a false name and was acting nervous, and requested Mr. Torres' consent to search the vehicle:

---

[4] Although Ms. Espinoza's admissions and the request to search the vehicle are recorded on different videos, the timeline can be established by comparing the footage.  After learning Ms. Espinoza's real identity, Officer Ramirez' lapel camera footage shows him writing her identifying information on a notepad and handing it to Officer Frias.  *See* Govt. Exhibit 3 at 13:29.  Officer Frias' own lapel camera footage shows him returning to Mr. Torres' SUV with the notepad in hand.  *See* Govt. Exhibit 4 at 0:00.  Approximately fifty-six seconds later, Officer Krause requests Mr. Torres' consent to search the vehicle for the first time.  *See* Govt. Exhibit 4 at 0:56.  Thus, the LCPD officers were aware of Ms. Espinoza's false identity and her admitted intent to purchase narcotics prior to requesting the search.

NATHAN KRAUSE: She's acting pretty nervous.  Is there—would there be an issue with you letting us search the vehicle real quick to make sure there's nothing in here?

RONALD WILLIAM TORRES: No, sir.

NATHAN KRAUSE: Huh?  Like, no, you don't want me to or yes, I can?

RONALD WILLIAM TORRES: You can (inaudible) search the vehicle if you want.

NATHAN KRAUSE: We can search the vehicle?

RONALD WILLIAM TORRES: Like you're going to do a search, right?

NATHAN KRAUSE: That's what I'm asking for just because of the way she's acting.

RONALD WILLIAM TORRES: Why is she acting like that?

NATHAN KRAUSE: I don't know, man.  Maybe she's worried about something else, but the way she's acting, I don't know.

MANUEL FRIAS: We're not hearing the conversation over there, that's why so (inaudible) ask if it's okay to search the car just real quick.  Like I said, all we're looking for is she (inaudible) at all.

RONALD WILLIAM TORRES: All right.

*Doc. 27-2*, Govt. Exhibit 2-A at 9.  *See also* Govt. Exhibit 2 at 15:46.  Approximately sixteen minutes and thirty seconds after initiation of the traffic stop, Officer Frias asked Mr. Torres to step out of the car and informed Mr. Torres that he would conduct a pat down to make sure Mr. Torres had no weapons.  *See* Govt. Exhibit 4 at 1:32; Govt. Exhibit 2 at 16:27.  While performing the pat-down search, Officer Frias found a gun, which officers subsequently determined to be loaded.

Mr. Torres, who had previously been convicted of murder in the second degree and conspiracy to commit murder in the second degree on May 17, 2007, was arrested for possession of a firearm by a convicted felon in violation of 18 U.S.C. 922(g)(1).  *See doc. 1.*  Mr. Torres filed a motion to suppress the firearm evidence, which he claims was illegally obtained, on September 25, 2018.  *Doc. 18.*

## II.    LEGAL STANDARD

The Fourth Amendment of the U.S. Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend IV.   In order to protect this right and deter police misconduct, courts exclude unconstitutionally obtained evidence.  "[T]he judicially created exclusionary rule…when applied, excludes evidence obtained in violation of the Fourth Amendment from being used at trial."  *United States v. McCane*, 573 F.3d 1037, 1042 (10th Cir. 2009) (citing *Herring v. United States*, 555 U.S. 135 (2009)). The defendant carries the burden of proving that evidence was illegally obtained and should be excluded.  *United States v. Long*, 176 F.3d 1304, 1307 (10th Cir. 1999).

## III.    ANALYSIS

### A.  The traffic stop was valid at its inception.

Mr. Torres first argues that the traffic stop was invalid at its inception because the officers lacked reasonable suspicion that he had engaged or was engaging in any criminal activity.  *Doc. 18* at 5.  However, for the reasons that follow, this argument lacks merit.

"A traffic stop for a suspected violation of law is a 'seizure' of the occupants of the vehicle and therefore must be conducted in accordance with the Fourth Amendment."  *Heien v. North Carolina*, 135 S. Ct. 530, 536 (2014) (internal citation omitted).  A traffic stop satisfies the Fourth Amendment standard if either 1) the stop is

based on an observed violation, or 2) the officer has a "reasonable articulable suspicion" that a violation has occurred or is occurring. *United States v. McRae*, 81 F.3d 1528, 1533 (10th Cir. 1996) (internal quotation omitted); *see also United States v. Sanchez*, 519 F.3d 1208, 1213 (10th Cir. 2008). Reasonable suspicion, in this context, requires "a particularized and objective basis for suspecting the particular person stopped of breaking the law." *Heien*, 135 S. Ct. at 536 (citing *Prado Navarette v. California*, 134 S. Ct. 1683, 1688 (2014)).

1. <u>Parking Violation</u>

Officer Krause had a reasonable, articulable suspicion that Mr. Torres had just committed a parking violation. Both Officer Lujan and Officer Krause personally observed a white SUV illegally parked on Colorado Avenue.[5] Tr. at 11, 30. Although the officers lost sight of the vehicle after it turned south on S. Espina Street, Officer Krause subsequently caught up to the SUV in less than a block or two. Officer Krause testified that the vehicle was not directly observed for only five to ten seconds. Tr. at 85. When Officer Krause regained a clear view of the vehicle, it was the sole white SUV headed southbound on Espina. Tr. at 78.

---

[5] Even if Officer Krause had not personally observed the violation, it would not change the analysis. Under the "collective knowledge" doctrine, "the legality of the detention of a suspect by an officer can be supported by information possessed by a fellow officer who requests the detention, even if the requesting officer does not communicate the information to the other officer." *United States v. Wilkinson*, 633 F.3d 938, 939–40 (10th Cir. 2011). This doctrine applies to traffic stops for misdemeanors as well as felonies. *Id.* at 940.

Mr. Torres has argued in his briefing and in oral argument that LCPD officers could not reliably identify Mr. Torres' vehicle as the white SUV observed by Officer Lujan on Colorado Avenue, because officers lost sight of the vehicle and Espina is a busy road. *See* Tr. at 135, *doc. 18* at 5–6. However, "reasonable suspicion" does not require absolute certainty of wrongdoing. Based on the description of the vehicle and Officer Krause's own observation of the vehicle when it was illegally parked, the extremely short period of time in which LCPD officers had no eyes on the vehicle, and the fact that only one white SUV was headed south on Espina Street, Officer Krause undoubtedly had a reasonable, articulable suspicion that Mr. Torres' vehicle was the same one that had, moments earlier, been illegally parked on Colorado Avenue. This suspicion standing alone justified a valid traffic stop.

2. <u>Drug Activity</u>

In addition, based on the surveillance of Officers Lujan and Morales, LCPD officers had a reasonable, articulable suspicion that the occupants of the vehicle had just purchased narcotics. An ongoing federal narcotics investigation had identified the surveilled apartment on Colorado Avenue as a location from which drugs were being distributed. The officers involved in the stop of Mr. Torres were aware that several stops of individuals leaving the location had led to the discovery of illegal narcotics. Tr. at 13, 95–96. Based on Officer Lujan's experience, the female passenger's behavior— exiting Mr. Torres' vehicle for approximately sixty seconds in order to visit the

apartment, then returning to the waiting SUV—was indicative of a drug transaction. Tr. at 10, 12–13.

As Defendant points out, Officer Lujan did not directly observe the female passenger enter the targeted apartment. Indeed, he testified that the entrance to the duplex was on the opposite side of the building from his surveillance position, so he directly observed her only until she moved in front of the duplex building. Tr. at 22. Consequently, Defendant argues, Officer Lujan could not have concluded that she visited the targeted apartment. *See* Tr. at 140. To the contrary, his conclusion that she visited the relevant apartment was reasonable. First, he testified that the only other apartment in the duplex was unoccupied. Tr. at 12. Second, the extremely short period of time between when the passenger exited the vehicle and returned to it makes it very unlikely that she managed to go to one of the other buildings in the surrounding area. *See* Tr. at 22; *see also* Govt. Exhibit 9.

Moreover, the fact that Officers Lujan and Morales did not actually observe the suspected drug transaction does not preclude reasonable suspicion. "[E]ven ambiguous behavior, susceptible to an innocent interpretation, may give rise to a reasonable suspicion of criminal activity depending on the totality of the circumstances." *United States v. Hishaw*, 235 F.3d 565, 570 (10th Cir. 2000) (internal quotation omitted). In *Hishaw*, officers stopped the defendant (ostensibly for a traffic violation) because they had received information from confidential informants that a certain apartment was

being used to distribute drugs, and, during surveillance, had "observed the defendant making hand-to-hand contact with several individuals outside the apartment." *Id*. The court found that the traffic stop was supported by reasonable suspicion of drug activity despite the fact that "no officer ever observed [him] engaged in any illegal activity during the many hours of surveillance." *Id*. at 569. Similarly, in *United States v. Carter*, officers conducting ongoing surveillance of a known "drug house" stopped the defendant's vehicle after he parked parallel to the suspect house and, on two or three occasions, a female passenger exited and then returned to the vehicle for periods of less than one minute, though officers were unable to see whether she actually entered the residence. 172 F. App'x 883, 884 (10th Cir. 2006) (unpublished).[6] The court held that officers had reasonable suspicion of drug activity and were justified in conducting the traffic stop. *Id*. at 886.

Here, FBI Task Force officers were conducting ongoing surveillance of a known "drug house." On at least four or five prior occasions during their investigation, vehicles stopped leaving the house had contained illegal narcotics. Tr. at 13, 95–96. Ms. Espinoza's brief visit to the home while Mr. Torres waited in the vehicle was, according to the experience of the officers, characteristic of a drug transaction. These facts provided a particularized and objective basis for suspecting that the occupants of the

---

[6] "Unpublished decisions are not precedential, but may be cited for their persuasive value." 10th Cir. R. 32.1(A).

SUV had engaged in a drug transaction.  *See Sanchez*, 519 F.3d at 1215 (courts defer to the judgment of law enforcement officers in distinguishing innocent from suspicious behavior).  Consequently, they had the reasonable, articulable, and particularized suspicion necessary to conduct a traffic stop on that basis.

### B.  Officers extended the traffic stop based on reasonable suspicion.

In addition to being supported by reasonable suspicion, a valid investigative detention such as a traffic stop must be "of limited scope and duration."  *United States v. Hammond*, 890 F.3d 901, 904 (10th Cir. 2018) (quoting *United States v. Davis*, 94 F.3d 1465, 1467–68 (10th Cir. 1996)).  A traffic stop "become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission."  *Rodriguez v. United States*, 135 S. Ct. 1609, 1612 (2015) (internal quotation marks omitted) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)).  Beyond this time period, detention "is only justified if the officer 'has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring…[or] the initial detention has become a consensual encounter.'"  *McRae*, 81 F.3d at 1534 (quoting *United States v. Gonzalez-Lerma*, 14 F.3d 1479, 1483 (10th Cir. 1994)).  An officer's conduct must be "evaluate[d]…in light of 'common sense and ordinary human experience.'"  *Id*. (quoting *United States v. Melendez-Garcia*, 28 F.3d 1046, 1052 (10th Cir. 1994)).

The Government does not argue that the detention of Mr. Torres became at any point consensual.  However, it does argue that the extension of the stop was supported

by reasonable suspicion. *See doc. 27* at 9–14. In this case, LCPD officers had several reasons for extending the traffic stop beyond checking Mr. Torres' documentation. There was suspicious behavior on the part of the passenger, Ms. Espinoza; the prior surveillance of the vehicle stopping at a known drug house for what, to Officers Lujan and Morales, resembled a drug-related transaction; and an odor of burnt marijuana in the vehicle. The undersigned agrees with the Government's position that these factors created reasonable suspicion sufficient to extend the traffic stop. Ms. Espinoza's admissions after questioning also justified the subsequent request to search the vehicle.

1. <u>Passenger Behavior</u>

Near the beginning of the traffic stop, Officer Frias asked the passenger, later identified as Ms. Espinoza, for her name and identification. *See doc. 27-1*, Govt. Exhibit 1-A at 2; Govt. Exhibit 1 at 1:50. She gave the name Audrey Oliver, but could provide no form of identification to corroborate that identity. When asked what her social security number was, she paused and was unable to give any portion of it. These facts made the officers suspicious that she was concealing her identity. Tr. at 100. Thus, when the "Audrey Oliver" moniker came back "clear" on dispatch, Officer Frias still suspected that the female passenger was concealing her identity. Tr. at 102–03. Consequently, Officer Frias then asked Ms. Espinoza to step out of the vehicle and talk further to the officers. *See* Govt. Exhibit 1 at 5:37; Govt. Exhibit 2 at 6:05. During her conversation with Officer Ramirez, Ms. Espinoza ultimately admitted that she had

given a false name, that she had gone to the surveilled house to purchase heroin, and that she had a blunt concealed in her bra. *See doc. 27-3*, Govt. Exhibit 3-A at 6–11.

Mr. Torres contends that it was an unlawful extension of the stop to question the passenger about her identity in the first place. *See doc. 18* at 7. However, "because passengers present a risk to officer safety equal to the risk presented by the driver, an officer may ask for identification from passengers and run background checks on them as well." *United States v. Rice*, 483 F.3d 1079, 1084 (10th Cir. 2007) (internal citation omitted).[7] *See also Sanchez*, 519 F.3d at 1215 ("The Supreme Court has recognized passengers may present a risk to officer safety equal to that of the driver.") (citing *Maryland v. Wilson*, 519 U.S. 408, 413–14 (1997)). Indeed, "an officer making a traffic stop may order passengers to get out of the car pending completion of the stop." *Sanchez*, 519 F.3d at 1215 (quoting *Maryland*, 519 U.S. at 415). *See also United States v. Dennison*, 410 F.3d 1203, 1211 (10th Cir. 2005) (quoting *Maryland*, 519 U.S. at 414–15) ("'the additional intrusion [of a request to exit the car] on the passenger is minimal.'"). In short, there is nothing *per se* unlawful about asking a passenger for identification during a traffic stop.

---

[7] *United States v. Marquez-Diaz*, 325 F. App'x 637, 644 (10th Cir. 2009) (unpublished), a later, non-precedential case, was distinguished from *Rice* on the basis that the officer questioned the passenger *after* receiving the "all clear" on the driver. Checking passengers' identification was permissible in *Rice* because "the officer had not received an all clear on the driver before checking the passengers' identification." *Id.* Even if the Court adopts the rule of *Marquez-Diaz*, officers in this case began questioning Ms. Espinoza prior to receiving the "all clear" on dispatch for Mr. Torres. *See doc. 27-1*, Govt. Exhibit 1-A at 2–3.

Moreover, although Mr. Torres characterizes the officers' suspicions as a mere "hunch" regarding Ms. Espinoza's behavior (*see doc. 34* at 4), they in fact had ample reason to be suspicious. Ms. Espinoza appeared nervous, could not provide any form of identification, and, when asked for her social security number, she notably paused and was unable to provide any portion of it. In addition, there was a strong odor of burnt marijuana in the car, and Ms. Espinoza did not have a medical marijuana card.[8] The lack of identification, coupled with her nervousness, indicated to both Officer Krause and Officer Frias that she might be lying about her identity. Tr. at 83–84, 102. As Officer Frias explained in his hearing testimony, the fact that the name "Audrey Oliver" came back "clean" on dispatch did nothing to verify that Ms. Espinoza was who she said she was, given the lack of photo identification. Tr. at 102–03.

Courts "defer to the 'ability of a trained law enforcement officer to distinguish between innocent and suspicious actions.'" *Sanchez*, 519 F.3d at 1215 (quoting *United States v. Santos*, 403 F.3d 1120, 1124 (10th Cir. 2005)). A lack of identification can serve as a basis for suspicion. *See Rice*, 483 F.3d at 1081 (name provided by a backseat passenger was suspicious where officer testified that "in his experience, if someone says they do not have identification on them, they are often trying to conceal their identity"). A nervous demeanor may also constitute at least one basis for suspicion. *See, e.g.,*

---

[8] The burnt marijuana odor—another factor contributing to reasonable suspicion of both Mr. Torres and Ms. Espinoza—is discussed separately in Section III(B)(3), *infra*.

*United States v. DeJear*, 552 F.3d 1196, 1201 (10th Cir. 2009) (identifying nervousness as a relevant factor in analyzing the presence of reasonable suspicion); *United States v. Garcia*, 751 F.3d 1139, 1146–47 (10th Cir. 2014) ("*Garcia II*") ("Nervous behavior…may be relevant to reasonable suspicion"); *United States v. Marquez-Diaz*, 325 F. App'x 637, 645 (10th Cir. 2009) (unpublished) (nervousness one factor in establishing reasonable suspicion). The undersigned finds reasonable the LCPD officers' judgments that Ms. Espinoza's conduct—including nervousness, inability to remember her social security number, and failure to provide any form of identification—was suspicious.

Mr. Torres argues that, even if officers did have reasonable suspicion pertaining to Ms. Espinoza, they violated the Fourth Amendment by continuing to detain Mr. Torres during her questioning. *See doc. 34* at 3–4 ("[I]f the officers suspected Ms. Espinoza of something, they should have detained Ms. Espinoza and informed Mr. Torres that he was free to go."). However, Tenth Circuit case law does not separate a driver from his passengers in this way. "[A] car passenger…will often be engaged in a common enterprise with the driver, and have the same interest in concealing the fruits or the evidence of their wrongdoing." *Dennison*, 410 F.3d at 1213 (quoting *Wyoming v. Houghton*, 526 U.S. 295, 304–05 (1999)). In *Dennison*, the driver and owner of the vehicle was cooperative, presented valid identification, and remained non-confrontational and cooperative even after his passenger was arrested for outstanding warrants. Nevertheless, the court concluded that officers had sufficient "reasonable and

articulable suspicion" to ask him to exit his vehicle, handcuff him, and conduct a search of his truck incident to the passenger's arrest. *Id*. at 1212. More pertinently still, the Tenth Circuit held in *Rice* that "[t]he district court…[improperly] discounted the fact that the false identity provided by the back seat passenger contributed to reasonable suspicion vis-à-vis Rice [the driver]." 483 F.3d at 1085.

Ms. Espinoza's behavior cast suspicion on Mr. Torres. Officers had articulable reason to believe that Ms. Espinoza, like the passenger in *Rice*, was providing them with a false identity, and this "contributed to reasonable suspicion vis-à-vis" Mr. Torres, the driver. *Id*. In addition, Ms. Espinoza's suspicious behavior cannot be viewed in isolation of the articulable suspicion that she had been involved in a drug transaction just minutes prior. LCPD officers had reason to suspect Ms. Espinoza of criminal wrongdoing even before she lied about her identity. Mr. Torres, in turn, was the driver of the vehicle during this suspected drug transaction. These facts together suggested precisely the kind of "common enterprise" that frequently connects driver and passenger. *Dennison*, 410 F.3d at 1213. In short, Ms. Espinoza's overall behavior justified extension of the stop of Mr. Torres beyond checking his documentation.

2. <u>Suspected Drug Transaction</u>

As explained above, a traffic stop "become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission." *Rodriguez*, 135 S. Ct. at 1612 (quoting *Caballes*, 543 U.S. at 407). Mr. Torres' observed parking violation was one

purpose of the stop, but it was clearly not the only one. Because suspected drug purchasing activity was also a valid purpose of the traffic stop, LCPD officers were justified in extended the stop to complete the "mission" of investigating this potential drug crime. *See Hishaw*, 235 F.3d at 569–70 (suspicions of drug trafficking activity, based on a tip-off that defendant was a dealer and observing the defendant making hand-to-hand contact with other individuals outside of a surveilled drug house, justified not only a traffic stop but also an immediate pat-down search of the vehicle's occupants); *Carter*, 172 F. App'x at 886 (Court of Appeals agreed with the district court that officers had reasonable suspicion, based on their observations of a passenger approaching a known drug house two or three times for periods of under one minute, sufficient to stop the vehicle "for the purpose of further investigation").

The mission of investigating the suspected drug transaction is also inextricably bound up with LCPD officers' questioning of Ms. Espinoza, whom Officer Lujan observed approaching the residence on Colorado Avenue. Indeed, based on Officer Ramirez's interaction with Ms. Espinoza, *see generally doc. 27-3*, Govt. Exhibit 3-A, it is quite clear that LCPD officers were in fact investigating the suspected drug activity during the traffic stop. The reasonable suspicion of drug activity, particularly in combination with Ms. Espinoza's suspicious conduct, fully justified the extension of the stop.

3. Burnt Marijuana Odor

It is well-established under Tenth Circuit precedent that the odor of burnt marijuana, without more, creates reasonable suspicion to prolong a traffic stop and conduct a search of the vehicle. *United States v. Snyder*, 793 F.3d 1241, 1244 (10th Cir. 2015) (citations omitted) ("Our cases establish that the smell of burnt marijuana alone establishes probable cause to search a vehicle for the illegal substance."); *see also United States v. Nielsen*, 9 F.3d 1487, 1491 (10th Cir. 1993) ("The smell of burnt marijuana" alone "would lead a person of ordinary caution to believe the passenger compartment might contain marijuana."). In this case, LCPD officers immediately noticed the strong odor of burnt marijuana upon initiation of the traffic stop. *See doc. 27-1*, Govt. Exhibit 1-A at 2 ("Ooh, that stinks. […] The marijuana."). Mr. Torres contends that, because he had a valid medical marijuana card, the burnt marijuana odor did not give rise to a reasonable suspicion of criminal activity. *See* Tr. at 163. Of course, with or without a medical marijuana card, possession of marijuana is still illegal under federal law. *See* 21 U.S.C. § 844. Moreover, medical marijuana has been legalized in both Colorado and New Mexico for a number of years without any apparent weakening of the long-standing rule affirmed in *Snyder*. *See* NMSA 1978, § 26-2B-7(G) (medical marijuana legalized in New Mexico in 2007, approximately eight years before the decision in *Snyder*). Thus, the strong odor of burnt marijuana, which established probable cause to search the

vehicle for the illegal substance, also provided reasonable suspicion of possession of marijuana adequate to prolong the stop.

In addition to reasonable suspicion of possession of marijuana, there also existed reasonable suspicion of driving under the influence of marijuana. In *United States v. Brown*, 555 F. App'x 838, 839 (10th Cir. 2014) (unpublished), officers had reasonable suspicion to extend a traffic stop and search the vehicle when they were "overwhelm[ed] with the smell of burnt marijuana." The fact that the defendant had a valid medical marijuana card did not obviate the reasonable suspicion because, as the court explained,

> …that is no defense in Colorado or elsewhere to a charge of impaired driving. If Mr. Brown had stunk of alcohol rather than marijuana surely an officer wouldn't have been forced to let him go on his way just because he said he uses his whiskey for medicinal purposes.

*Id.* (internal citations omitted). Defendant Torres points out that Officer Krause did not personally believe that Torres was under the influence of marijuana. *See* Tr. at 65. This argument was also made and rejected in *Brown*:

> To this, Mr. Brown replies that the officer didn't believe he was intoxicated or prolong the detention with that possibility in mind. That much may be true, but the Fourth Amendment measures an officer's conduct against what is *objectively* reasonable, not by his *subjective* beliefs.

555 F. App'x at 839 (citations omitted). Officer Krause testified that the strong smell of burnt marijuana in the SUV indicated that someone had been recently smoking in the vehicle and that it is illegal to operate a vehicle while smoking marijuana in the state of

New Mexico.  Tr. at 99.  Accordingly, as in *Brown*, LCPD officers had reasonable

suspicion to extend the stop in order to determine whether Mr. Torres might be driving

under the influence.

Finally, unlike the defendant in *Brown*, Mr. Torres had a passenger in the car who

was not in possession of a medical marijuana card.  Recreational marijuana use has not

been legalized in New Mexico.  Therefore, the presence of the passenger created

additional suspicion of illegal activity in conjunction with the strong odor of burnt

marijuana.

4.  Totality of the Circumstances

Any of these circumstances—the passenger's behavior, the suspected drug

transaction at the Colorado house, and the burnt marijuana smell—would alone justify

the relatively brief extension of the traffic stop here.  But, of course, the proper inquiry

is whether the totality of these circumstances created reasonable suspicion.  *See*

*Marquez-Diaz*, 325 F. App'x 637, 645 (10th Cir. 2009) ("[A]ny one of these factors,

standing alone, may be inadequate to establish reasonable suspicion.  We do not,

however, 'divide and conquer' by considering each factor in isolation.") (citing *United*

*States v. Karam*, 496 F.3d 1157, 1165 (10th Cir. 2007)); *United States v. Wood*, 106 F.3d 942,

946 (10th Cir. 1997) (citations omitted) ("the existence of objectively reasonable

suspicion of illegal activity does not depend upon any one factor, but on the totality of

the circumstances").

I find that the combined circumstances described above create ample reasonable suspicion to extend the stop up to the time of Ms. Espinoza's admissions that she had provided a false identity, that she had gone to the apartment to purchase heroin, and that she had a blunt of marijuana concealed in her bra. Of course, once Ms. Espinoza made these admissions (beginning at approximately eleven minutes into the stop, *see* Govt. Exhibit 3 at 10:20), officers had probable cause to further investigate both Ms. Espinoza, who had admittedly gone to the residence to purchase heroin, and Mr. Torres, who had driven her there and waited for her while she entered. At that point, there can be no serious argument that LCPD officers' subsequent request to search the vehicle, *see doc. 27-2*, Govt. Exhibit 2-A at 9, was not supported by adequate suspicion of criminal activity.

Mr. Torres argues that, in spite of these circumstances, his detention should have ended when Officer Krause stated: "[H]e's valid, insurance is good, he's got a medical marijuana card. I got nothing unless you guys want to push the issue with her coming and going for that little bit of time." *Doc. 34* at 3 (quoting *doc. 27-2*, Govt. Exhibit 2-A at 3). Essentially, Mr. Torres argues that Officer Krause *admitted* there was no further reason to detain him. Ultimately, however, this statement is irrelevant. Even disregarding the fact that Officer Krause was only one of several LCPD officers at the scene, whose opinions might differ from his own, the test of reasonable suspicion is an objective one. *See United States v. Neff*, 300 F.3d 1217, 1222 (10th Cir. 2002) (citation

omitted) ("In measuring the actions of a police officer under the Fourth Amendment…we look at the objective facts, not the officer's state of mind.").  So long as the totality of the circumstances would have justified a reasonable officer's suspicion of criminal activity, as it does here, extension of the stop is constitutional.

In conclusion, there was no constitutionally improper extension of the traffic stop at any time, and the firearm evidence should not be suppressed on this basis.

### C.  Consent to search the vehicle was freely and voluntarily given.

In his briefing, Mr. Torres argues that he did not voluntarily consent to the search of his vehicle.  *Doc. 18* at 9–10, *doc. 34* at 4–5.  This argument was not pressed further at the suppression hearing.  Nonetheless, I will briefly address the issue.

Assuming without deciding that Mr. Torres' consent was required for officers to search the vehicle,[9] such consent was given.  Police may search a vehicle without a warrant or probable cause if consent is "freely and voluntarily given."  *United States v. Pena*, 143 F.3d 1363, 1366 (10th Cir. 1998) (quoting *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968)).  "[T]he question whether a consent to search was in fact 'voluntary' or was the product of duress and coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances."  *United States v. Latorre*, 893 F.3d

---

[9] Arguably, the circumstances which provided reasonable suspicion to extend of the stop also provided probable cause for a search of the vehicle.  If so, neither consent nor a warrant would be required to conduct the search.  *See Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996).

744, 756 (10th Cir. 2018) (internal quotation marks omitted) (quoting *Schneckloth v.*

*Bustamonte*, 412 U.S. 218, 227 (1973)).

Consent must be (1) clear and unequivocal, and (2) "given without duress or

coercion, express or implied." *United States v. Guerrero*, 472 F.3d 784, 789 (10th Cir.

2007) (citation omitted). The first prong can be satisfied by verbal or non-verbal

conduct. *Id*. at 790. As to the second prong, the determinative question is "whether a

reasonable person would believe he was free to leave *or* to deny the officer's request to

search." *Id*. (emphasis added) (citation omitted). Courts consider a number of factors in

making this determination, including but not limited to the presence of multiple

officers, brandishing of a weapon, physical contact, aggressive language or tone,

location and surroundings, and whether the defendant was physically restrained. *See,*

*e.g., id.*; *United States v. Silva-Aretza*, 602 F.3d 1208, 1214–15 (10th Cir. 2010). *See also*

*United States v. Contreras*, 506 F.3d 1031, 1037 (10th Cir. 2007) (factors supporting a

finding of voluntariness included "(1) [the officer's] casual phrasing of the request; (2)

his tone of voice; (3) his lack of a show of force; (4) his stop in broad daylight on an

interstate highway; and (5) Ms. Contreras's repeated responses of 'okay' when the

officer reiterated his requests for consent."). Police detention at the time of the request

"is only one factor to be considered in determining whether consent was voluntarily

and freely given based on the totality of the circumstances." *Id*.

The totality of the circumstances strongly supports a finding of voluntary consent in this case.  First, Mr. Torres' consent was clear and unequivocal.  Mr. Torres was initially asked, "[W]ould there be an issue with you letting us search the vehicle real quick to make sure there's nothing in there?"  He responded, "No, sir."  *Doc. 27-2*, Govt. Exhibit 2-A at 9.  *See also* Govt. Exhibit 2 at 15:46.  It is clear from his non-verbal body language, combined with his verbal reply, that he was consenting to the search.  Nonetheless, Officer Krause made sure to clarify by asking, "Like, no, you don't want me to or, yes, I can?"  Mr. Torres responded, "You can (inaudible) search the vehicle if you want."  *Doc. 27-2*, Govt. Exhibit 2-A at 9.  And a few moments later, Officer Frias said, "[T]hat's why so (inaudible) ask if it's okay to search the car just real quick.  Like I said, all we're looking for is she (inaudible) at all."  And Mr. Torres responded, "All right."  *Id*.  Consequently, Mr. Torres consented clearly and unequivocally no fewer than three times.  *See id.*; Govt. Exhibit 2 at 15:46.

Second, the totality of the circumstances did not create a threatening or coercive atmosphere.  The stop occurred in broad daylight, on a well-traveled street, and in a residential neighborhood.  Lapel camera footage shows that there was no show of force or brandishing of weapons throughout the encounter.  Indeed, Officers Frias and Krause used a markedly casual, even friendly, tone while conversing with Mr. Torres.  The same conversational, non-threatening tone was used when Officer Krause asked Mr. Torres' permission to search the vehicle.  A reasonable person would have believed,

based on the circumstances and tone of the request, that he was free to refuse.  For these reasons, I find that Mr. Torres' consent to search the SUV was voluntarily given.

### D. The pat-down search was constitutional because officers reasonably suspected that Mr. Torres was armed and dangerous.

Finally, Mr. Torres argues that the pat-down search that revealed the firearm was unlawful because officers lacked reasonable suspicion that he was armed and dangerous.  *See doc. 18* at 10.  Upon consideration, I find that the pat-down search was constitutional.

#### 1. *Terry* Analysis

The Supreme Court has recognized the serious intrusiveness of a pat-down search, *see Terry*, 392 U.S. at 17, 24–25, and its purpose is not to uncover evidence but to "allow the officer to pursue his investigation without fear of violence."  *United States v. Manjarrez*, 348 F.3d 881, 886–87 (10th Cir. 2003).  A pat-down search, or "frisk," is permitted by the Fourth Amendment where officers reasonably suspect that a detained individual may be armed and dangerous.  *See Terry v. Ohio*, 392 U.S. 1, 24 (1968) (officer may conduct pat-down search where he is "justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others"); *United States v. Hammond*, 890 F.3d 901, 905 (10th Cir. 2018) ("During the course of a valid investigative detention, an officer may conduct a limited protective search ('frisk') if the officer harbors an articulable and reasonable

suspicion that the person is armed and dangerous.") (internal quotation marks omitted) (quoting *United States v. Davis*, 94 F.3d 1465, 1468 (10th Cir. 1996)). This *Terry* analysis applies in the context of a valid traffic stop. *See, e.g.*, *Hammond*, 890 F.3d at 905.

The determinative question is an objective one: whether a "reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *See id*. (quoting *Terry*, 392 U.S. at 27). Consequently, the subjective good faith of the arresting officer is insufficient to justify a pat-down search. *Terry*, 392 U.S. at 22 (internal citation omitted). However, an officer may draw "reasonable inferences…in light of his experience." *Id*. at 27.

Objective reasonable suspicion requires more than a "mere hunch," but it nevertheless "represents a 'minimum level of objective justification,' [internal citation omitted] and 'need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard.'" *Rice*, 483 F.3d at 1083 (quoting *Arvizu*, 534 U.S. at 274). In determining the validity of a pat-down search, a court considers the "totality of the circumstances." *United States v. Garcia*, 459 F.3d 1059, 1064 (10th Cir. 2006) ("*Garcia I*") (quoting *Manjarrez*, 348 F.3d at 887). This is, by nature, a fact-specific analysis. *See Terry*, 392 U.S. at 30 ("Each case of this sort will, of course, have to be decided on its own facts.").

Courts consider a number of factors in determining whether it was reasonable for officers to suspect that an individual was armed and dangerous. In its briefing and

during oral argument and cross-examination, the Government highlighted the following factors contributing to reasonable suspicion: (1) criminal history, (2) known gang membership, (3) a recent shooting in which Mr. Torres was the victim, and (4) the increased dangerousness of a detained individual when he exits his vehicle.

The first relevant factor identified by the Government both in its briefing (*see doc. 18* at 20) and in hearing testimony is Mr. Torres' criminal history. The parties stipulate that Mr. Torres has one criminal conviction for a murder committed thirteen years ago, and that at the time of the traffic stop and arrest he was on probation. Tr. at 134. Previous convictions and even arrests can carry weight in the *Terry* analysis. *See, e.g.*, *Hammond*, 890 F.3d at 907 (defendant's prior conviction and recent arrest for weapons possession were relevant to the determination); *Garcia II*, 751 F.3d 1139, 1145 ("knowledge of the [defendant's] armed robbery conviction supported reasonable suspicion that Mr. Garcia was armed and dangerous"); *United States v. Palmer*, 360 F.3d 1243, 1248 (10th Cir. 2004) (defendant's criminal record, combined with furtive movements toward the glove box, justified protective search). A criminal record "standing alone…is not sufficient to create reasonable suspicion of anything." *Hammond*, 890 F.3d at 906 (quoting *United States v. Rice*, 483 F.3d 1079, 1085 (10th Cir. 2007)). Where, however, "the circumstances of the stop itself interact with an individual's criminal history to trigger an officer's suspicions, that criminal history becomes critically relevant for *Terry*-purposes." *Id*. at 907. In other words, criminal

history, where it is accompanied by other bases for suspicion, is an important factor in evaluating the likelihood that an individual is armed and dangerous.

A reasonable officer could certainly conclude that a prior conviction for murder, when coupled with other bases for suspicion, raises the likelihood that an individual is armed and dangerous. At the suppression hearing, Mr. Torres attempted to downplay the importance of his conviction by emphasizing the temporal distance between the conviction and the recent arrest. *See* Tr. at 72, 134, 147. However, the Tenth Circuit has addressed this issue previously and concluded: "We do not think the passage of time significantly diminishes the relevance of this criminal history [armed robbery conviction nine years ago] in the context of an officer in the field assessing a safety risk." *Garcia II*, 751 F.3d at 1145. There is no reason to suppose that Mr. Torres' criminal history should be discounted for purposes of a *Terry* analysis; if anything, Mr. Torres' crime was more serious than the armed robbery at issue in *Garcia II*, and hardly less recent. Mr. Torres' criminal history therefore properly contributed to the officers' reasonable suspicion that he was armed and dangerous.

Second, LCPD officers were familiar with Mr. Torres as a known gang member. Tr. at 32, 131. Gang membership can be a relevant factor in determining whether an individual is likely to be armed and dangerous. *See Hammond*, 890 F.3d 901, 907 (relevant to *Terry* analysis that defendant was a "known gang member"); *Garcia I*, 459 F.3d 1059 ("apparent gang connection" provided additional reason for *Terry* search;

collecting cases in which gang membership was relevant). Officer Krause testified at the suppression hearing that, in his experience, gang members are almost always armed. Tr. at 72. While this factor, in isolation, does not create the requisite reasonable suspicion, *see Hammond*, 890 F.3d at 906, it is certainly a relevant consideration in evaluating the totality of the circumstances.

Third, officers were aware that Mr. Torres had been a victim of a shooting nine months prior and that he had been uncooperative during the investigation. Tr. at 91. At the time of the shooting, Mr. Torres was unarmed. *Id*. However, Officer Frias testified that this occurrence, in combination with Mr. Torres' lack of cooperation and gang affiliation, led officers to believe that Mr. Torres was now likely to be armed in the interest of protection and "self-help." Tr. at 131–32.

Fourth, both Officer Krause and Officer Frias testified that concern for officer safety increases when a suspect exits a car. Tr. at 89, 130–31. Officer Krause explained that suspects are often not patted down until they exit the vehicle. Tr. at 81. Officers are entitled to draw "reasonable inferences…in light of [their] experience," *Terry*, 392 U.S. at 27, and the LCPD officers' experience with respect to traffic stop safety is considerable. *See also Dennison*, 410 F.3d at 1206 (evidence was legally obtained where officers pat-down searched and handcuffed defendant after asking him to exit his vehicle, in order to conduct a search incident to his passenger's arrest).

On the other hand, Mr. Torres has emphasized several factors that weigh against reasonable suspicion that he was armed and dangerous: (1) the location and time of day, (2) the non-violent nature of the parking violation, (3) the number of officers versus detainees, (4) the lack of furtive movements or bulges in clothing, and (5) Mr. Torres' cooperative and non-threatening attitude. *See doc. 18* at 11–12; Tr. at 138. In addition, Mr. Torres argued at the suppression hearing that the LCPD officers' actions indicated that they were not, in fact, afraid for their safety. *See* Tr. at 137–38.

I agree that the time and the location of the stop—midday on a busy street in a safe neighborhood—raised no special concerns about officer safety. *Cf. McRae*, 81 F.3d at 1536 (officer stopped defendant on an "isolated stretch of highway," which supported his belief that a pat-down search was necessary to ensure his safety). It is also beyond dispute that the officers on scene outnumbered the vehicle occupants, Mr. Torres and Ms. Espinoza. *Cf. Garcia II*, 751 F.3d at 1145–46 (single officer who "needed to turn his back to [defendant] to conduct the inventory search" was "reasonably concerned for his safety"). Similarly, the Government has not asserted that Mr. Torres engaged in any furtive movements or that there were bulges in his clothing signifying the possibility of concealed weapons. Finally, Mr. Torres was undeniably pleasant and cooperative throughout the entire encounter. All of these factors somewhat mitigate the concerns about officer safety.

As to Mr. Torres' argument based upon the non-violent nature of the parking

violation for which Mr. Torres was purportedly stopped, I am unpersuaded.  While the

parking violation was the nominal reason for the stop, LCPD officers' real interest in

Mr. Torres was obviously related to the suspected drug transaction.  Moreover, by the

time Officer Frias conducted the pat-down search of Mr. Torres, Ms. Espinoza had

already admitted to going to the house on Colorado Avenue to purchase heroin, *see*

Govt. Exhibit 3 at 10:20–10:30, which strongly supported the initial suspicion.  While

Mr. Torres is surely correct that an individual pulled over for a parking violation is, all

things being equal, less likely to pose a danger to officers or attempt to flee the scene,

the plain fact is that police believed Mr. Torres to be involved in a much more serious

drug-related crime.  The Tenth Circuit "ha[s] held that a connection with drug

transactions can support a reasonable suspicion that a suspect is armed and

dangerous."  *Garcia I*, 459 F.3d at 1064–65 (collecting cases).  *See also id*. at 1065 (quoting

*United States v. Sakyi*, 160 F.3d 164, 169 (4th Cir. 1998)) ("[t]he indisputable nexus

between drugs and guns presumptively creates a reasonable suspicion of danger to the

officer"); *id*. (quoting *United States v. Bustos-Torres*, 396 F.3d 935, 943 (8th Cir. 2005) (*cert.*

*denied*, 545 U.S. 1109 (2005)) ("Because weapons and violence are frequently associated

with drug transactions, it is reasonable for an officer to believe a person may be armed

and dangerous when the person is suspected of being involved in a drug transaction");

*United States v. Johnson*, 364 F.3d 1185, 1194–95 (10th Cir. 2004) ("Because Officer

Middleton reasonably suspected that [the defendant] might be involved in drug dealing, kidnapping, or prostitution, [his intention to conduct a pat-down search] did not exceed the scope of his suspicions."). In light of this precedent, the nature of the suspected crime actually weighs against Mr. Torres in the *Terry* analysis. LCPD officers' reasonable suspicion of his involvement in a drug transaction contributed to the reasonable suspicion that he was armed and dangerous.

Finally, Mr. Torres argued at the suppression hearing that the LCPD officers, judging by their behavior during the traffic stop, did not actually believe that Mr. Torres posed a threat. *See* Tr. at 137–38. However, an officer's subjective fear (or lack of fear) of a suspect is not material to the Fourth Amendment inquiry. "[T]he test of officer safety is objective rather than subjective, and therefore the officer need not personally be in fear." *Dennison*, 410 F.3d at 1213 (citing *Neff*, 300 F.3d at 1222) (dismissing defendant's contention that "officer testimony did not reflect safety concerns during his detention"). Where "[t]he facts available…would warrant a man of reasonable caution to believe that a frisk would be necessary to protect himself," the question of whether the officer demonstrated actual fear for his safety, by either conduct or testimony, is irrelevant. *McRae*, 81 F.3d at 1536 (officer's permitting the defendant to put his jacket on before getting out of the car, even though "a jacket is a likely place in which to store a weapon," did not affect the outcome of the *Terry* analysis). In short, it does not matter whether "there was no evidence in the record that

the officers in fact feared for their safety." *Neff*, 300 F.3d at 1222. "In measuring the

actions of a police officer under the Fourth Amendment…we look at the objective facts,

not the officer's state of mind." *Id*. This line of argument is consequently without merit.

Having identified the relevant factors, the final step of the *Terry* analysis is to

weigh the totality of the circumstances in determining whether the LCPD officers'

suspicion that Mr. Torres was armed and dangerous was objectively reasonable. I find

that it was. The officers were ultimately justified in performing the pat-down search

due to (1) Mr. Torres' serious criminal history, (2) his known gang affiliation, (3) his

suspected involvement in a drug transaction minutes prior, corroborated by Ms.

Espinoza's admissions, (4) the previous shooting in which he was a victim and did not

cooperate in the investigation, and (5) the increased risk to officer safety when Mr.

Torres exited the vehicle. In light of these considerations, a reasonable officer would

suspect that Mr. Torres might be armed and "would be warranted in the belief that his

safety or that of others was in danger." *Manjarrez*, 348 F.3d at 886–87 (quoting *Terry*,

392 U.S. at 27). The fact that Mr. Torres was courteous and cooperative throughout the

traffic stop, and made no furtive movements, certainly weighs in his favor. However,

even compliant individuals may reasonably be suspected to be armed and dangerous.

*See Garcia I*, 459 F.3d at 1067 (the fact that defendant was compliant and made no

threatening statements or movements did not render officers' pat-down search

unreasonable); *Dennison*, 410 F.3d at 1211–12 (defendant was cooperative and non-

threatening when officers arrested his passenger, but officers were justified in suspecting that he was armed and dangerous and in conducting a search). Similarly, the number of officers, and the time and location of the stop, are relevant considerations but do not eclipse the weightier factors giving rise to officer safety concerns. Having considered the totality of the circumstances, I find that the pat-down search of Mr. Torres was justified and did not violate the Fourth Amendment.

2. Armed *and* Dangerous

Mr. Torres contends that the two elements of "armed and dangerous" are completely distinct. Tr. at 138. Thus, he argues that he should prevail because, even if LCPD officers had reason to believe he was armed, there was no cause to believe he was *also* dangerous. To show this lack of dangerousness, he points out that he had been very cooperative and that it would be unreasonable to expect a person stopped for a parking violation to shoot an officer during the course of such a stop. Tr. at 138–39.

Indeed, most cases analyzing the constitutionality of a *Terry* pat-down ask whether there was a reasonable articulable suspicion that a person was "armed *and* dangerous." *See, e.g.*, *Hammond*, 890 F.3d at 905 (emphasis added). Nonetheless, it is the rare case which breaks down the analysis into two distinct inquiries. One such case is *United States v. House*, 463 F. App'x 783, 785–86 (10th Cir. 2012) (unpublished). In *House*, an officer engaging in a consensual encounter with a pedestrian observed a folded knife sticking out of the pedestrian's jacket pocket. After removing the knife, he

conducted a *Terry* pat-down search of the pedestrian and found a firearm.  *Id*. at 875.

Beyond observing the folded knife, the officer had no basis to suspect that the

pedestrian was further armed.  *Id*. at 784–90 (characterizing the idea that because there

was a knife, there could be a firearm, as a mere "hunch").  The court found that, because

the officer observed the knife, the "armed" requirement of a *Terry* frisk was satisfied.

*Id*. at 788.  However, the court held that there was no basis to suspect that the

pedestrian was dangerous, and therefore suppressed the firearm discovered in the pat-

down.  *Id*. at 786–90.  In reaching this conclusion about dangerousness, the *House* court

pointed out *inter alia* that (1) the pedestrian was not detained but was involved in a

consensual encounter, (2) there was no evidence that the pedestrian was involved in

drug trafficking, (3) there was no evidence that the pedestrian was involved in gang

activity, (4) the knife was closed and posed no "danger to an armed officer standing six

to eight feet away," and (5) the knife had already been removed at the time of the pat-

down.  *Id*.

It is immediately apparent that the circumstances of *House* differ markedly from

the instant case.  The officers here had reasonable suspicions that Mr. Torres was

currently involved in drug trafficking and was a gang member who had recently been

the victim of a gang-related shooting.  These suspicions meant that they reasonably

suspected that he was armed with a firearm, not a folded pocket knife.  Moreover, he

was detained as a result of a traffic stop.  Furthermore, the Tenth Circuit has clarified

the ruling of *House* in a subsequent unpublished decision:

> In this nonprecedential case, police lacked any other indication that Mr. House was dangerous besides the glimpse of a knife; here, there were several other factors that could cause a reasonable officer to fear for his safety.  Furthermore, we rejected this argument in [*Garcia II*], noting that while the armed and dangerous test is conjunctive, each element cannot be viewed in isolation because that would ignore the unavoidable interaction between them.

*United States v. Hughart*, 645 F. App'x 678, 683–84 (10th Cir. 2016) (unpublished) (citing

*Garcia II*, 751 F.3d at 1143 n.7).  As the court in *Garcia II* explained, "[w]e agree the

'armed and dangerous' test is conjunctive, but the dissent's view forecloses

consideration of how an officer's suspicion that an individual is dangerous can affect

that officer's suspicion that an individual is armed, and vice versa."  751 F.3d at 1143

n.7.

Whether one approaches the analysis as two distinct questions or as a single

intertwined concept, the officers here reasonably suspected that Mr. Torres was armed

and dangerous.  I have explained the basis for that conclusion above, but here I will

focus on dangerousness.  First, this pat-down was conducted during a traffic stop and

Mr. Torres was detained.  This fact, combined with a reasonable suspicion that an

individual is armed, may alone be sufficient on the question of dangerousness.  As the

court explained in *Rice*,

> An officer in today's reality has an objective, reasonable basis to fear for his or her life every time a motorist is stopped.  Every traffic stop, after all, is a confrontation.  The motorist must suspend his or her plans and

anticipates receiving a fine and perhaps even a jail term. That expectation becomes even more real when the motorist or a passenger knows there are outstanding arrest warrants or current criminal activity that may be discovered during the course of the stop. We further recognized that "[r]esort to a loaded weapon is an increasingly plausible option for many such motorists to escape those consequences, and the officer, when stopping a car on a routine traffic stop, never knows in advance which motorists have that option by virtue of possession of a loaded weapon in the car." An officer may therefore take reasonable "steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him. Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties."

483 F.3d at 1083 (internal quotation and citations omitted). Indeed, even the majority in *House* appeared to accept the dissent's argument that "a person who is armed and detained is usually dangerous." *House*, 463 F. App'x at 789 (rejecting dissent's conclusion because defendant was not detained); *see also Pennsylvania v. Mimms*, 434 U.S. 106, 112 (1977) (In context of a traffic stop, the Court held, without further analysis on dangerousness, that the "bulge in the jacket permitted the officer to conclude that [the defendant] was armed and thus posed a serious and present danger to the safety of the officer."). Second, the officers were aware that Mr. Torres had been previously convicted of murder—perhaps the singularly most violent crime. Third, the officers were not merely investigating a parking violation. Not only had they observed the suspicious stop at the Colorado duplex, but the passenger had already told them the purpose of that stop—to acquire heroin. *See* Govt. Exhibit 3 at 10:20–10:30. Not only is it well recognized that drug traffickers are often armed and dangerous, but the officers

would reasonably fear Mr. Torres' reaction given their expectation of finding illegal narcotics in the vehicle. Finally, Mr. Torres was a known gang member who had been uncooperative with the police's investigation into his own shooting. Tr. at 91. Notwithstanding Mr. Torres' cooperation during the traffic stop up until the search, the officers could reasonably fear that cooperation might end at any time.

For all these reasons, I conclude that the officers reasonably suspected Mr. Torres of being both "armed and dangerous."

## IV. CONCLUSION

For the foregoing reasons, I find that (1) the traffic stop was justified at its inception, (2) the duration of the stop was not unlawfully extended, (3) Mr. Torres' consent to search the vehicle was voluntary, and (4) the pat-down search was constitutional because it was reasonable to suspect that Mr. Torres was armed and dangerous. I therefore RECOMMEND that the Court DENY Mr. Torres' Motion to Suppress (*doc.* 18).

GREGORY B. WORMUTH
UNITED STATES MAGISTRATE JUDGE

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1).  **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition.  If no objections are filed, no appellate review will be allowed.**