IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                    No. 18cr2748 KG

RONALD WILLIAM TORRES,

    Defendant.

## MEMORANDUM OPINION AND ORDER
## DENYING MOTION TO SUPPRESS

THIS MATTER is before the Court on Defendant's Objections (Doc. 41) to the Magistrate Judge's Proposed Findings and Recommended Disposition ("PF&RD") (Doc. 38). The Magistrate Judge recommended denial of Defendant's Motion to Suppress (Doc. 18). Following a *de novo* review of the parties' briefing (Docs. 18, 27, 34), the evidentiary record, and the applicable law, the Court adopts the findings and conclusions of the PF&RD except as stated below, and therefore denies the Motion.

I.     Legal Standard

A. *28 U.S.C. § 636(b)*

This case was referred to the Magistrate Judge to conduct hearings and perform legal analysis pursuant to 28 U.S.C. § 636(b)(1)(B), (b)(3), and *Va. Beach Fed. Sav. & Loan Ass'n v. Wood*, 901 F.2d 849 (10th Cir. 1990). (Doc. 25). Under the referral provision of § 636(b), the Court's standard of review of a magistrate judge's PF&RD is *de novo*. *See* 28 U.S.C. § 636(b)(1)(C). When resolving objections to the magistrate judge's PF&RD, "[t]he district judge must consider *de novo* any objection to the magistrate judge's recommendation. The district judge

may accept, reject, or modify the recommendation, receive further evidence, or resubmit the matter to the magistrate judge with instructions." Fed. R. Crim. P. 59(b)(3). "[A] brief order expressly stating the court conducted de novo review is sufficient." *Northington v. Marin*, 102 F.3d 1564, 1570 (10th Cir. 1996) (citing *In re Griego*, 64 F.3d 580, 583–84 (10th Cir. 1995)).

    B. *Fourth Amendment*

Where a criminal defendant files a Fourth Amendment-based motion to suppress, the Government bears the burden of showing, by a preponderance of the evidence, that the criminal defendant's Fourth Amendment rights were not violated. *United States v. Matlock*, 415 U.S. 164, 177 (1974). However, "[t]he proponent of a motion to suppress has the burden of adducing facts at the suppression hearing indicating that his own rights were violated by the challenged search." *United States v. Eckhart*, 569 F.3d 1263, 1274 (10th Cir. 2009) (quoting *United States v. Allen*, 235 F.3d 482, 489 (10th Cir. 2000)). In ruling on a motion to suppress, the Court views the facts in the light most favorable to the Government. *See United States v. Matthews,* 458 F. App'x 717, 722 (citing *United States v. Myers,* 308 F.3d 251, 255 (3d Cir. 2002)).

    II.    <u>Objections to Findings of Fact</u>

Defendant makes a number of objections to the findings of fact contained in the PF&RD, which the Court will address in turn. Except as explicitly stated below, the Court adopts the Magistrate Judge's findings of fact. (Doc. 38 at 1–6).

    1.    Defendants objects to the Magistrate Judge's findings that Officer Arturo Morales was in the vehicle conducting surveillance with Officer Lujan on the date in question (Doc. 41 at 3). Although Officer Morales' involvement was described in the Government's Response brief, (Doc. 27), his name was not mentioned during the December 6, 2018 hearing or in any of the

submitted exhibits. Because Officer Morales' name does not appear in the record, Defendant's objection to this finding is sustained. However, none the legal conclusions in the PF&RD relied on the observations of Officer Morales and thus this amended finding does not affect any of those conclusions.

2. Defendant objects to the Magistrate Judge's finding that "Officer Morales observed a white SUV," again because Officer Morales' name does not appear within the record. (Doc. 41 at 3). This objection is essentially the same as the first and is therefore sustained.

3. Defendant objects to the finding that "'the officers' saw the female passenger approach the duplex," because Officer Lujan did not have a clear view, could not see the east side of the duplex, and did not see the passenger entering an apartment. (Doc. 41 at 3). To the extent the Magistrate Judge found that Officer Morales saw the female passenger approaching the duplex, the objection is sustained. However, the Court adopts the Magistrate Judge's findings with respect to Officer Lujan.

Whether Officer Lujan observed the passenger entering the apartment is irrelevant to the finding that he observed her "approach[ing] the duplex." (Doc. 38 at 2). Officer Lujan could have observed the passenger approaching the duplex (a building) without seeing her enter a specific apartment. Indeed, the Magistrate Judge found that Officer Lujan saw the passenger approach the duplex but was "unable to see which apartment she entered." (Doc. 38 at 2).

As to Officer Lujan's observation of the passenger approaching the duplex, the Court does not agree with Defendant's assertion that Officer Lujan did not have a clear view of the east side of the duplex. Officer Lujan stated in his hearing testimony: "I had a clear, free and unobstructed view of the whole east side, the direction of where that apartment was." Tr. at 8. He later repeated, in response to defense counsel's questioning about the two intervening buildings in the area, "I

3

had a clear view." Tr. at 20. Officer Lujan's only uncertainty was with respect to the apartment the passenger entered, not the building she approached. Also in response to defense counsel's questioning about the building, Officer Lujan stated, "I'm most certain that the female did not enter the building with the green roofs. She entered the other one." Tr. at 19. "The other one" referred to the target building under surveillance. Defendant presents no argument that Officer Lujan's testimony on these points was not credible and the Court finds it credible. Officer Lujan admitted that he did not have a clear view of whether she entered the target *apartment*. Tr. at 19. This statement in no way undermines his stated conclusion that the passenger approached the target duplex. Defendant's objection is overruled as it pertains to observations made by Officer Lujan.

4. Defendant's fourth objection appears to be substantively identical to his third. Accordingly, for the same reasons, it is overruled except with respect to any findings about Officer Morales' involvement.

5. Defendant objects to the Magistrate Judge's "implication that the passenger entered an apartment." (Doc. 41 at 3). Specifically, Defendant objects to the following phrase in the PF&RD: "Though they were unable to see which apartment she entered, Officer Lujan explained in his testimony that only the target apartment was occupied at the time; the other was vacant." (Doc. 38 at 2). Defendant argues, once again, that Officer Lujan did not have a clear view, that he did not see the passenger approach or enter an apartment, and that he could not see the east side of the duplex.

As explained previously, Officer Lujan testified that he had a "clear view" of the east side of the duplex. Tr. at 8. He expressed certainty about which building the passenger approached, but admitted that he could not see which of the two apartments she approached. Tr. at 19. The findings of the PF&RD were that the female passenger approached the duplex, that Officer Lujan

4

could not see which of the two apartments the passenger approached, and that the other apartment in the duplex was unoccupied. These facts of record fully support the conclusion that the passenger entered, or at least approached, the target apartment. Viewing the evidence in the light most favorable to the Government, the Court adopts the Magistrate Judge's finding and overrules Defendant's objection.

6. Defendant next objects to the Magistrate Judge's omission of a finding that Officer Lujan could not see the east side of the duplex where the doors are located. (Doc. 41 at 3). Again, Officer Lujan testified that he had a clear view of the east side of the duplex. Tr. at 8. The Magistrate Judge's findings were that Officer Lujan had a view of the passenger approaching the duplex, but did not have a view of which apartment she approached or entered. (Doc. 38 at 2). These findings are both consistent with the record, and do not omit the fact that Officer Lujan could not see the two apartment doors. This objection is accordingly overruled.

7. Defendant objects to the Magistrate Judge's omission of a finding that Officer Lujan could not see if the passenger approached or entered the target apartment. (Doc. 41 at 4). The Magistrate Judge found that Officer Lujan could not clearly see which apartment the passenger approached or entered, and added the additional relevant information that only the target apartment was occupied. (Doc. 38 at 2). There was no omission of the fact that Officer Lujan could not see the apartment door, so this objection is overruled.

8. Defendant objects to the Magistrate Judge's references to "surveillance officers," because only Officer Lujan's name appears on the record. (Doc. 41 at 4). As explained in reference to Defendant's first objection, the Court sustains the objection and adopts only those findings that pertain to Officer Lujan.

9. Defendant objects to the Magistrate Judge's omission of a finding that nine other residences are located on the same block as the target apartment. (Doc. 41 at 4). This fact is both undisputed, and evident from the transcript and exhibits. Tr. at 24; Def. Ex. 1. In addition, the number of residences on that block is irrelevant because Officer Lujan expressed no doubt that it was the target duplex the passenger approached. He stated: "Once it was in *that duplex*, once it passed that field, my field of view, I lost visual." Tr. at 22 (emphasis added). However, to the extent that it is relevant and not self-evident on a review of the record, the Court here finds that nine other residences were located on the same block as the target apartment.

10. Defendant objects to the omission of a finding that "the surveillance and the traffic stop occurred in congested residential areas with many people, vehicles, and houses." (Doc. 41 at 4). The Magistrate Judge described the location of the stop as a "busy street" and a "residential neighborhood." (Doc. 38 at 25, 31). It was established during the hearing that the area of surveillance and stop was a "congested residential area." Tr. at 54. This fact is undisputed and evident from the record. To the extent that this finding was not made in the PF&RD, and although no conclusions of law are altered by the inclusion or omission of this finding, the Court here finds that the surveillance and stop occurred in a congested residential area.

11. Defendant objects to the omission of a finding that "Espina Street was very busy with vehicular traffic at the time of the surveillance and stop." (Doc. 41 at 4). In fact, the Magistrate Judge referred to the location of the stop as a "busy street." (Doc. 38 at 31). Whether Espina Street was busy at the time of surveillance (as distinguished from the time of the stop) is not relevant. Officer Lujan's observations of the vehicle on Colorado Avenue were not impeded by the flow of traffic on Espina Street. Therefore, the objection is overruled.

12. Defendant objects to the omission of a finding that Mr. Torres did not commit a moving traffic violation. (Doc. 41 at 4). Defendant's commission (or lack thereof) of a moving traffic violation was not at issue in this case, because the Government never stated or implied that he committed a moving traffic violation. Nothing required the Magistrate Judge to make findings that Defendant did not commit violations that were never in question. Accordingly, this objection is overruled.

13. Finally, Defendant objects to "the Magistrate Judge's characterization of Mr. Torres as a drug trafficker." (Doc. 41 at 4). However, the Magistrate Judge did not make a factual finding that Mr. Torres was a drug trafficker. Rather, the findings of the PF&RD were that: (1) the target apartment on Espina Street was "the subject of an ongoing federal investigation into drug trafficking," (Doc. 38 at 2), and (2) Defendant's passenger admitted to going to the target apartment to purchase heroin, (Doc. 38 at 5). Therefore, the Magistrate Judge concluded that the officers reasonably suspected Defendant of involvement in drug trafficking activity. The Magistrate Judge's factual findings did not relate to Defendant's actual status as a drug trafficker, but to Las Cruces Police Department ("LCPD") officers' suspicions that he might be involved in drug trafficking activity. Therefore, this objection is overruled and the Magistrate Judge's findings are adopted.

III. Objections to Conclusions of Law

A. *Inception of the Stop*

Defendant argues that the traffic stop was not justified at its inception because the general description of the vehicle illegally parked on Colorado Avenue was insufficient to justify the stop of a vehicle matching that description on Espina Street. (Doc. 41 at 6). Defendant correctly states that officers lost sight of the vehicle after observing the parking violation and before initiating the

traffic stop. Tr. at 53, 56–57, 77–78. However, the Court does not agree that this temporary loss of visual meant the traffic stop was unjustified.

Defendant appears to make no objection to the Magistrate Judge's recital of the applicable legal standard, (Doc. 38 at 7–8), and the Court adopts it upon *de novo* review. A traffic stop is constitutional if either the stop is based on an observed traffic violation, or the officer has a "reasonable articulable suspicion" that a violation has occurred or is occurring. *United States v. McRae*, 81 F.3d 1528, 1533 (10th Cir. 1996). Defendant argues that Officer Krause's stop of Defendant did not satisfy this legal standard because Officer Krause did not have a reasonable suspicion that the white SUV driving south down Espina Street was the same white SUV observed on Colorado Avenue.

However, the cases cited by Defendant in support of his argument are clearly distinguishable from the case at hand. In *United States v. Martinez*, 910 F.3d 1309, 1311 (10th Cir. 2018), a police officer heard a report at 12:13 p.m. of a suspicious white Cadillac seen heading east from Flagstaff, Arizona at 11:00 a.m. *Id.* Police suspected that the Cadillac was connected with an earlier bank robbery in Winslow, Arizona. After hearing the report, the officer encountered a white Cadillac traveling east on I-40 and initiated a traffic stop. The stop occurred more than an hour after the initial sighting of the white Cadillac, 65 miles from Winslow, and 130 miles from Flagstaff. *Id.* at 1314. Moreover, the traffic stop required the dual inferences that the Cadillac spotted in Flagstaff was connected with the robbery in Winslow, and that the Cadillac traveling east on I-40 was the same one seen in Flagstaff. *Id.* The court held that the officer lacked reasonable suspicion to stop the Cadillac. *Id.* at 1317.

*United States v. Jones*, 998 F.3d 883 (10th Cir. 1993), also cited by Defendant, involves facts somewhat closer to the case at hand. After receiving a radio call about a black Mercedes

8

with two African-American men driving westbound from an apartment in Albuquerque, officers stopped an African-American family in a black Mercedes driving southbound approximately five minutes later, a mile and a half from the apartment. *Id*. at 884. The court found that, based on the time elapsed since the incident, "the car could have been anywhere in a seven square-mile area." *Id*. at 885 n.1. Because the Mercedes was stopped in a major population center on a weekday afternoon, and because police had little idea where the target vehicle might have traveled in the time elapsed, the court found a lack of reasonable suspicion to support the stop. *Id*. at 885.

In both *Martinez* and *Jones*, the time elapsed and the distance driven since the initial sighting of the vehicle was considerably greater than in the instant case. The white SUV observed on Colorado Avenue traveled approximately one to two blocks before it was again spotted by Officer Krause. Tr. at 53. This is vastly different from the 65 miles traveled in *Martinez*, or even the one and a half miles traveled in *Jones*. In addition, Officer Krause testified that police lost visual of the white SUV for approximately five to ten seconds. Tr. at 85. The Cadillac in *Martinez* was unobserved for over an hour, and the Mercedes in *Jones* was unobserved for approximately five minutes in a metropolitan area. The minimal time and distance during which the white SUV was not observed signify that, unlike in *Jones*, the SUV's location could be pinpointed within a relatively small area. "General descriptions, standing alone" may be insufficient to support a finding of reasonable suspicion. *Martinez*, 910 F.3d 1309, 1316 (quoting *United States v. Clarkson*, 551 F.3d 1196, 1202 (10th Cir. 2009)). But Officer Krause did not here rely on a general description standing alone. Officers lost sight of the white SUV when it was traveling southbound on Espina Street. Tr. at 85. Five to ten seconds later, one to two blocks away, Officer Krause observed a white SUV traveling southbound on Espina Street just as the target vehicle was expected to do. Tr. at 78, 85. It was the only white SUV traveling south on Espina at that time.

Tr. at 78. Moreover, he had personally observed the white SUV that had committed the parking violation. Tr. at 30. Taken together, these facts supported a reasonable suspicion that the white SUV was the same one observed illegally parked on Colorado Avenue, and that its occupants were potentially involved in drug activity at the surveilled apartment.

B. *Extension of the Stop*

Defendant next objects to the Magistrate Judge's determination that the extension of the traffic stop was supported by reasonable suspicion. Defendant does not object to the Magistrate Judge's general characterization of the legal standard. A traffic stop may extend only to "the time reasonably required to complete the[e] mission," and "[a]uthority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez v. United States*, 13 S. Ct. 1609, 1612, 1614 (2015) (citations omitted). However, as noted in the PF&RD, a traffic stop need not always end upon completion of the original mission. Where reasonable suspicion exists, the vehicle occupants may be further detained. *Id*. at 1615. In other words, if the officer "has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring," the traffic stop may be prolonged past the point necessary to address the original purpose of the stop. *McRae*, 81 F.3d at 1534 (quoting *United States v. Gonzalez-Lerma*, 14 F.3d 1479, 1483 (10th Cir. 1994)).

Defendant argues that the LCPD officers lacked reasonable suspicion of illegal activity sufficient to prolong the stop. (Doc. 41 at 7). First, he argues that Officer Krause's statement of "I got nothing"[1] indicated that there was no valid reason to prolong the stop. The Court is unpersuaded by this argument for the reason articulated in the PF&RD: Officer Krause's subjective

---

[1] In full, Officer Krause stated: "[H]e's valid, insurance is good, he's got a medical marijuana card. I got nothing unless you guys want to push the issue with her coming and going for that little bit of time." (Doc. 27-2 at 3).

10

assessment of the situation holds little to no weight in the objective determination of reasonable suspicion. (Doc. 38 at 22–23). "In measuring the actions of a police officer under the Fourth Amendment…we look at the objective facts, not the officer's state of mind." *United States v. Neff*, 300 F.3d 1217, 1222 (10th Cir. 2002). The correct question is whether the LCPD officers had an objective basis for reasonable suspicion of illegal activity, and Officer Krause's personal and subjective statement is not dispositive of this issue.

Defendant also contends that the officers had no legitimate reason to detain Ms. Espinoza, the female passenger, and that even if they did, they should have released Defendant while they investigated her. The Court agrees with the Magistrate Judge's analysis on both of these issues. The LCPD officers' suspicion of Ms. Espinoza was more than a "hunch," (Doc. 41 at 9). Ms. Espinoza had, minutes earlier, been observed approaching a duplex under active surveillance for drug trafficking activity. Tr. at 12–13. Based on Officer Lujan's training and experience, this behavior resembled a drug transaction. *Id*. In addition, Ms. Espinoza's behavior during the traffic stop was suspicious. She could not provide any form of identification when asked, did not know her social security number, and appeared nervous. Tr. at 100–03. The Court agrees with and adopts the Magistrate Judge's analysis of these facts. (Doc. 38 at 13–17). Nervousness, in combination with other factors, can be relevant to reasonable suspicion. *See United States v. DeJear*, 552 F.3d 1196, 1201 (10th Cir. 2009). More importantly, the inability to provide identification can be relevant to reasonable suspicion. *See United States v. Rice*, 483 F.3d 1079, 1081 (10th Cir. 2007). Based on their training and experience, Officers Krause and Frias both believed that Ms. Espinoza's lack of identification was suspicious and might indicate a false identity. Tr. at 83–84, 102–03. This suspicion was, as it turned out, correct, since Ms. Espinoza initially gave the false name "Audrey Oliver." Tr. at 118. Courts "defer to the 'ability of a trained

law enforcement officer to distinguish between innocent and suspicious actions.'" *United States v. Sanchez*, 519 F.3d 1208, 1215 (10th Cir. 2008) (quoting *United States v. Santos*, 403 F.3d 1120, 1124 (10th Cir. 2005)).

Defendant's contention that he should have been free to go while officers investigated Ms. Espinoza is similarly contradicted by the case law. The Tenth Circuit has recognized the likelihood of a "common enterprise" between driver and passenger, *United States Dennison*, 410 F.3d 1203, 1213 (10th Cir. 2005) (quoting *Wyoming v. Houghton*, 526 U.S. 295, 304–05 (1999)), and has on more than one occasion upheld the detention of a driver based on his passenger's suspicious behavior. *See, e.g.*, *id.*; *Rice*, 483 F.3d at 1085. Furthermore, Defendant was independently implicated in at least part of Ms. Espinoza's suspicious behavior—namely, the stop on Colorado Avenue in front of the surveilled apartment, during which Defendant was driving the vehicle.

The Court is satisfied with the Magistrate Judge's analysis of the bases for reasonable suspicion, including Ms. Espinoza's behavior, Officer Lujan's surveillance, and the odor of burnt marijuana in the vehicle. (Doc. 38 at 12–23). The Court therefore adopts that analysis and finds that the extension of the stop was supported by reasonable suspicion.

C. *Probable Cause*

Defendant next objects to "the Magistrate Judge's conclusion that probable cause justified the search of the vehicle." (Doc. 41 at 9). This objection is overruled because the Magistrate Judge did not draw such a conclusion. In a footnote, the Magistrate Judge noted that, "*arguably*," there was probable cause for a search of the vehicle, and that if probable cause existed then no consent would be required. (Doc. 38 at 23 n.9) (emphasis added). A proposition that follows the word "arguably" should not properly be considered a conclusion.

Furthermore, no determination about the existence of probable cause was essential to the legal conclusions reached in the PF&RD, because the Magistrate Judge determined that the Defendant gave voluntary consent to search the vehicle. (Doc. 38 at 26). As explained below, the Court agrees with the Magistrate Judge's consent analysis. Defendant's objection is therefore groundless.

D. *Consent to Search*

Defendant objects to the Magistrate Judge's finding that Defendant gave voluntary consent to search his vehicle, arguing that video evidence of the encounter shows Defendant initially refusing, then succumbing to police coercion. (Doc. 41 at 10–12).

However, Defendant's description of the request to search, and Defendant's accompanying answer mischaracterizes the video evidence. Officer Krause initially asked the Defendant, "Is there—would there be an issue with you letting us search the vehicle real quick to make sure there's nothing in here?" (Doc. 27-2 at 9). Defendant replied, "No, sir." (Doc. 27-2 at 9). Defendant now characterizes this response as a refusal. (Doc. 41 at 11). However, his verbal response in the context of the question, in combination with his tone and body language, clearly indicated Defendant's acquiescence. Govt. Ex. 2 at 15:46. In an abundance of caution, Officer Krause followed up his question: "Huh? Like, no, you don't want me to or yes, I can?" (Doc. 27-2 at 9). Defendant once again gave his consent: "You can (inaudible) search the vehicle if you want." (Doc. 27-2 at 9). Again, his body language and tone clearly expressed an affirmative answer. Govt. Ex. 2 at 15:46. When Defendant confirmed, "Like you're going to do a search, right?" (Doc. 27-2 at 9), the evidence does not show, as Defendant now claims, that he was "realiz[ing] the inevitable," (Doc. 41 at 11). On the contrary, he had already given his consent not

13

once, but twice, and would subsequently give his consent for a third time. (Doc. 27-2 at 9) ("All right.").

Defendant also claims that he was "coerced" into giving his consent by the presence of multiple armed police officers, (Doc. 41 at 11), and Officer Krause's language (Doc. 41 at 12). Rather than asking "May we search the vehicle?" Defendant points out that Officer Krause asked, "We can search the vehicle?" (Doc. 41 at 12). What Defendant neglects to mention is that Officer Krause's phrasing was, in context, perfectly sensible. He had already requested consent to search twice, and Defendant had responded both times in the affirmative. Officer Krause was obviously confirming this prior consent, hence the confirmatory phrasing, "We can search the vehicle?" (Doc. 27-2 at 9).

With respect to the presence of armed police officers, the Court agrees with the Magistrate Judge's analysis of the factors relevant to determining voluntary consent. (Doc. 38 at 23–26). As Defendant has, himself, noted, the encounter between Defendant and the LCPD officers was markedly casual and cordial. (Doc. 41 at 13). There is simply no evidence of record to suggest that Defendant was coerced into giving his consent.

Finally, the Court need not address whether the Government "[met] its burden of showing that there was a break in the causal connection between the illegal seizure and the alleged consent," (Doc. 41 at 12), because no illegal seizure occurred.

E. *Constitutionality of the Pat-Down Search*

Defendant lastly objects to the Magistrate Judge's determination that the pat-down search of Defendant was reasonable because officers reasonably suspected that he was armed and dangerous. (Doc. 41 at 12).

Defendant does not object to the Magistrate Judge's recital of the applicable legal standard. A pat-down search, or "frisk," is justified if the officer "harbors an articulable and reasonable suspicion that the person is armed and dangerous." *United States v. Hammond*, 890 F.3d 901, 905 (10th Cir. 2018). The question is whether a "reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *See Hammond* at 905 (quoting *Terry v. Ohio*, 392 U.S. 1, 24, 27 (1968)). In deciding whether the officers' suspicions were reasonable, the court applies a "totality of the circumstances" test. *United States v. Garcia*, 459 F.3d 1059, 1064 (10th Cir. 2006) (quoting *United States v. Manjarrez*, 348 F.3d 881, 887 (10th Cir. 2003)). As described in the PF&RD, a number of factors are relevant to this analysis.

Defendant essentially contends that the Magistrate Judge weighed these factors incorrectly, and cites a number of factors that he claims weighed against reasonable suspicion. (Doc. 41 at 13–14). However, all of the factors cited by Defendant were discussed in the PF&RD and given due weight in the analysis. (Doc. 38 at 28–35). On *de novo* review, the Court agrees with and adopts that analysis. Defendant's respectful and friendly demeanor, his lack of furtive behavior, the absence of bulges in his clothing or other suspicious dress, the fact that the officers outnumbered the passengers, and the time and setting of the traffic stop were all discussed and accorded appropriate weight in the PF&RD. (Doc. 38 at 31, 34–35). While the Magistrate Judge did not explicitly address Defendant's alleged physical limitations from the prior shooting, there is no evidence of record to suggest that Defendant's ability to use a firearm was impaired, and the Court agrees with the Magistrate Judge's conclusion that LCPD officers "reasonably suspected that [Defendant] was armed with a firearm." (Doc. 38 at 36).

Defendant also asserts that "[t]he officers were relaxed and obviously did not feel threatened." (Doc. 41 at 13). This argument was correctly refuted in the PF&RD. (Doc. 38 at

15

33–34). The *Terry* analysis is unchanged even where there is "no evidence in the record that the officers in fact feared for their safety," because only "the objective facts, not the officer's state of mind" are relevant to the Fourth Amendment inquiry. *Neff*, 300 F.3d at 1222.

Defendant argues, as he did at the suppression hearing, Tr. at 138, that the "allegations under investigation were non-violent." (Doc. 41 at 13). Although this may be true, the allegations under investigation were certainly serious. The LCPD officers suspected Defendant not only of a parking violation, but of a drug-related offense. Officer Lujan had observed Defendant's vehicle stopping in front of the surveilled apartment, and Ms. Espinoza had at that point admitted to going to the target apartment to purchase heroin. Govt. Ex. 3 at 10:20–10:30. This admission obviously contributed to reasonable suspicion of Defendant, who was the driver of the vehicle and therefore presumably involved in Ms. Espinoza's illegal enterprise. "[A] connection with drug transactions," even standing alone, "can support a reasonable suspicion that a suspect is armed and dangerous." *Garcia*, 459 F.3d at 1065–1065. Here the connection with a drug transaction was only one of a number of factors indicating that Defendant could be armed and dangerous.

Finally, Defendant objects once again to the Magistrate Judge's "characteriz[ing] Mr. Torres as a drug trafficker with no support in the record for such a conclusion." (Doc. 41 at 14). As explained earlier, the Magistrate Judge did not find that Defendant was a drug trafficker. Rather, the Magistrate Judge concluded that the LCPD officers reasonably suspected Defendant of some involvement in the drug trafficking activity taking place at the surveilled apartment. This suspicion was reasonable, particularly given the passenger's statement that the purpose of the stop at the target apartment was to purchase heroin. Govt. Ex. 3 at 10:20–10:30. In any event, *Garcia*, the case on which the PF&RD's legal conclusions regarding drug involvement were based, makes no distinction between those suspected of "drug trafficking" and those suspected of involvement

in a "drug transaction." *Garcia*, 459 F.3d at 1065 (quoting *United States v. Sakyi*, 160 F.3d 164, 169 (4th Cir. 1998); *United States v. Bustos-Torres*, 396 F.3d 935, 943 (8th Cir. 2005)). The distinction between terms in this case is therefore essentially irrelevant. The Court agrees with and adopts the conclusion that the LCPD officers reasonably suspected Defendant of involvement in a drug transaction, and were therefore justified in suspecting he might be armed and dangerous.

Defendant's portrayal of the Magistrate Judge's reasoning, (Doc. 41 at 14), is both incomplete and misleading. Defendant argues that the Magistrate Judge found the pat-down search constitutional "because Mr. Torres had a conviction from thirteen years ago, the officers believed he was associated with a gang, and he was a shooting victim." (Doc. 41 at 14). In fact, the Magistrate Judge concluded that LCPD officers reasonably suspected Defendant was armed and dangerous because of:

> (1) Mr. Torres' serious criminal history [prior murder conviction], (2) his known gang affiliation, (3) his suspected involvement in a drug transaction minutes prior, corroborated by Ms. Espinoza's admissions, (4) the previous shooting in which he was a victim and did not cooperate in the investigation, and (5) the increased risk to officer safety when Mr. Torres exited the vehicle.

(Doc. 38 at 34). The Court agrees with and adopts the Magistrate Judge's analysis, and finds that the pat-down search was constitutional.

IV. <u>Conclusion</u>

For the foregoing reasons, upon a *de novo* review of the record and all documents, the Court hereby ADOPTS the Magistrate Judge's findings of fact except where explicitly stated to the contrary. The Court ADOPTS in full the Magistrate Judge's conclusions of law. Defendant's Motion to Suppress (Doc. 18) is therefore DENIED.

_____
UNITED STATES DISTRICT JUDGE

17